# EXHIBIT 7

# Morrison Declaration

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CAMERON KING,

                Plaintiff,

    - against –          **21-cv-1320 (GLS)(DJS)**

JASON L. ADAMEK, KENNETH C. SHORTT,   **FIRST AMENDED COMPLAINT**
JOSHUA BARTLETT, MICHAEL MADONIA,
SR., GREGORY GRANT, and DAVID MYERS,

                Defendants.

## PRELIMINARY STATEMENT

This is a civil rights action filed by Cameron King ("Mr. King" or "Plaintiff"), formerly a prisoner in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), for violations of his constitutional rights as secured by the Eighth Amendment to the United States Constitution brought pursuant to 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

1. The Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331.

2. The Northern District of New York is an appropriate venue under 28 U.S.C. § 1391(b)(2) as the situs of the events giving rise to the claims herein.

## JURY DEMAND

3. Plaintiff demands trial by jury in this action.

## THE PARTIES

**Plaintiff**

4. Mr. King is a resident of the City of Rochester and the State of New York. Mr. King was in the custody of DOCCS during the incidents described in this Complaint, however, he was released on October 22, 2021.

5. Mr. King has endured a decades-long struggle with medical and mental health issues.

6. Mr. King's chronic medical issues include, among other conditions, renal failure and non-Hodgkin's lymphoma, the latter of which is a cancer of the lymphatic system. Mr. King also suffers from a neurogenic bladder.

7. Mr. King's urinary issues, since childhood, require him to self-catheterize multiple times per day. This practice can be quite painful and, for Mr. King, has also caused a number of additional urinary problems including chronic infections.

8. To avoid potentially deadly infections Mr. King is very careful not to reuse catheters; however, while in DOCCS' custody he often struggled to get an adequate supply of sterile, single-use catheters and supplies.

**Defendants and State Actors**

9. **Jason L. Adamek** ("Defendant Adamek") was a correctional sergeant at Mid-State Correctional Facility at all times relevant to the claims. Defendant Adamek was also the area supervisor in charge of security staff at Mid-State Correctional Facility's secure housing unit. 10-1.

10. **Kenneth C. Shortt** ("Defendant Shortt") was a correctional officer at Mid-State Correctional Facility ("MidState") at all times relevant to the claims.

11. **David Ambrose** ("Ambrose") was a correctional officer at Mid-State at all times relevant to the claims. Defendant Ambrose was also the Fire and Safety Officer on duty at the time of the events for which this action is brought.

12. **Michael Madonia, Sr.** ("Defendant Madonia") was a corrections officer at Mid-State. He was the "paint gang" officer – meaning he coordinated and oversaw innates who worked to paint areas of the facility. Madonia is also widely known among the prisoners in the facility for being a "fixer" – meaning when an inmate has a dirty urine or something that he needs to address, Madonia can make it "disappear."

13. **John Nagle** ("Defendant Nagle") was a corrections officer at Mid-State. Mr. Nagle was on duty in the infirmary the day of the beating.

14. **David Myers** ("Defendant Myers") was a corrections officer at Mid-Stat.. He serves as the SOMPTA Officer and often drives the van while wearing his hat backwards.

15. **Gregory Grant** ("Defendant Grant") was a corrections officer at Mid-State who was serving as the "desk officer" on 10-1 the day of the beating.

16. **Joshua Bartlett** ("Defendant Bartlett") was serving as the "Rec Officer" on 10-1 the day of the beating.

17. **Craig Otens** ("Otens") was a training sergeant on the day of the beating.

## ALLEGATIONS

18. At the time of the events for which this action is brought, Mr. King was in custody at Mid-State in the Town of Marcy, New York.

19. Throughout 2019, Mr. King endured ongoing medical problems at Mid-State related to his need to self-catheterize with sterile catheters.

20. Mr. King was not being provided an adequate number of sterile single-use catheters and he was being forced to catheterize without a full bladder to provide urinalysis samples – which is extremely painful to him due to urethral strictures.

21. Mr. King communicated his need to gain an adequate supply of single-use catheters and supplies to DOCCS medical and security staff in various ways, including by filing grievances and sending letters both from himself and from Prisoners' Legal Services of New York on his behalf.

22. On or about November 5, 2019 Mr. King was in a fight with another prisoner who was a member of the "paint gang," a group of prisoners who have special privileges and are close with staff – including Defendant Madonia who operates the "paint gang."

23. Madonia was well known to be a "fixer" for inmates, who would make disciplinary tickets or positive urine tests "disappear" for favors.

24. That night while he slept, in retaliation for the fight with a paint gang member, Mr. King was attacked by other prisoners in retaliation for the fight. He was hit in the head with something heavy and solid – possibly a fire extinguisher or padlocks. After he was attacked, Mr. King was admitted to the Mid-State infirmary.

25. Mr. King suffered several lacerations on his head and bruising. Pursuant to procedure when a prisoner is injured, DOCCS' staff photographed all of Mr. King's injuries.

26. Mr. King refused protective custody yet remained in the infirmary pending an involuntary protective custody hearing.

27. On November 26, 2019 he was discharged from the infirmary despite the fact that his IPC hearing had not taken place.

28. Meanwhile, word had spread through the facility about the attack on Mr. King and the reasons for the attack.

29. On the morning of November 26, 2019, Defendant Nagle, who was the duty officer in the infirmary, entered Mr. King's infirmary room and conducted an unnecessarily rough pat frisk. He shoved King's face into the wall and caused his nose to bleed. Mr. King did not in any way resist nor give Defendant Nagle cause to manhandle him. Nagle then applied handcuffs to Mr. King but intentionally placed them on Mr. King backwards so they would inflict pain.

30. Defendant Nagle escorted Mr. King from the room to hand him off to Defendant Myers and Mr. Otens who were supposed to escort King to Involuntary Protective Custody in the 10-1 dorm, known as the Special Housing Unit (SHU).

31. Upon seeing King, Otens wiped blood from King's face.

32. When Mr. Otens noticed that the cuffs were placed on King backwards to cause pain he demanded the Nagle remove them. Otens placed his own cuffs on King, properly, and Myers and Otens placed King in a van and drove him to the 10-1 building.

33. When Mr. King arrived in the SHU block, he was taken to the strip frisk room to be processed for intake into the SHU.

34. Defendant Bartlett demanded that Mr. King "strip" for a strip frisk. Mr. King complied and stripped to his underwear. Mr. King was then cuffed.

35. Defendant Adamek stood in the threshold of the door to the strip frisk room.

36. At some point, Defendants Shortt, Myers, Madonia and Grant entered the room.

37. While facing the wall, Mr. King was hit in the back of the head and then in the right side of his body, causing him to fall to the floor.Mr. King was not resisting nor otherwise

being combative with Defendants. He was faced against the wall in the strip frisk room with his hands up against the wall.

38. Nonetheless, Defendants proceeded to beat Mr. King, who was restrained in handcuffs and wearing only his underwear.

39. While he was on the floor, the Defendants — with their boots on—kicked and stomped on Mr. King.

40. At one point you could hear Mr. King's ribs break.

41. After the beating, Mr. King was taken by two of the Defendants to cell 10-01-22 which had a mattress on the bed, as well as a pillow.

42. The Defendants kept coming to the door of Mr. King's cell and peering through the grate to check on him. Mr. King was in a tremendous amount of pain and was having difficulty breathing. He was sitting on the end of his bed with his head on his hands on his desk and could barely move.

43. One of the officers who beat him tried to give him an extra pillow and told him that if he would "stay quiet" about what happened he would have "no problems at Mid-State."

44. Mr. King still was having extreme difficulty breathing.

45. At approximately 2:45pm, a few minutes before the shift change, the Defendants finally determined that King would have to go to the infirmary.

46. At 2:51pm Defendant Adamek escorted King to the infirmary right before the new tour of officers arrived at 2:55pm.

47. During the escort by Defendant Adamek, King was told to report he had fallen on his bed.

48. At the infirmary, Defendant Adamek repeated the false narrative to Nurse Elliott Pohoreskey, RN II ("Nurse Pohoreskey") that Mr. King had "fallen" on his bed. Mr. King, in severe pain and fearing his assailants' threats, had no choice but to play along and agree as Sergeant Adamek remained in the examination room.

49. Defendant Adamek completed an Inmate Injury Report which falsely stated Mr. King "fell on his bed when no mattress on it." Defendant Adamek did not insist that pictures were taken – a deviation from protocol.

50. However, while in the infirmary, Defendant Adamek saw David Ambrose in the infirmary building. Mr. Ambrose had just started his shift. Adamek ordered Ambrose to take a camera over to 10-1 and take images of Mr. King's cell. Mr. Ambrose arrived on 10-1 at 3:18pm after all Defendants except Adamek had left for the day.

51. After examining Mr. King, Nurse Pohoreskey obtained a telephone order from Dr. Shehab Zaki ("Dr. Zaki") to admit Mr. King to the infirmary.

52. Mr. King was then admitted to the infirmary with an admission note documenting pain on his right back side and pain upon deep breath.

53. Meanwhile, to further conceal the beating, Defendants back on 10-1 staged the scene in cell 10-01-22 before leaving at the end of their tour at 3:00pm.

54. Defendants had already created a puddle of water near Mr. King's bed and pushed the mattress back from the edge of the bed.

55. Mr. Ambrose testified under oath that he did not see a cup or other receptacle for water in the cell or he would have photographed it.

56. Mr. Ambrose arrived and photographed the puddle as "evidence" in the investigation into Mr. King's "fall."

57. Defendant Adamek then returned from the infirmary to 10-1 to meet with Mr. Ambrose.

58. Defendant Adamek and Ambrose then completed an Accident/Injury Investigation Report in which Defendant Adamek falsely stated that Mr. King "slipped and fell."

59. Despite these efforts to hide the reason for Mr. King's injuries on November 27, 2019—the morning after the beating—Dr. Shazia Chaudhry ("Dr. Chaudhry"), a doctor at Mid-State, noted that Mr. King was "[status post] assault 11/26" in clinical notes.

60. Dr. Chaudhry further noted that Mr. King was experiencing shortness of breath, severe pain with breathing, pain on the right side of his chest and back, and that Mr. King was unable to stand up or take deep breaths.

61. Dr. Chaudhry ordered a chest x-ray for Mr. King, which revealed a "moderate-large right pneumothorax with displaced fractures of the right posterolateral ninth and tenth ribs."

62. Mr. King was then referred to the emergency room by nurse practitioner Asma Mohammad ("NP Mohammad"), with a referral note which also stated that Mr. King was "[status post] altercation 11/26/19."

63. On November 27, 2019, at approximately 10:05 AM, an ambulance arrived at Mid-State to transfer Mr. King to St. Elizabeth Medical Center ("SEMC") in Utica, New York.

64. When the ambulance arrived at Mid-State to transport Mr. King to the hospital, DOCCS' medical staff informed the ambulance personnel that Mr. King was assaulted on November 26 and struck on the right side of his body. Mr. King described feeling like his ribs were poking his lung.

65. At approximately 10:55 AM, Mr. King arrived at SEMC. Hospital staff noted that Mr. King was physically assaulted the previous day and now complained of right-sided chest wall pain.

66. Additional imaging performed at SEMC confirmed that Mr. King sustained closed fractures of multiple ribs causing a traumatic pneumothorax, a potentially life-threatening condition more commonly referred to as a collapsed lung.

67. As a result, Mr. King was admitted to SEMC requiring placement of a chest tube. A thoracic surgeon performed the chest tube placement the same day of admission.

68. Three days later, on November 30, 2019, the chest tube was finally removed.

69. The hospital attempted to discharge Mr. King but as he was terrified to return to Mid-State, he appealed the decision to release him.

70. After a near week-long hospital stay, Mr. King was finally discharged from SEMC on December 3, 2019. Upon returning to Mid-State, Mr. King was admitted to the infirmary.

71. On December 3, 2019, at approximately 7:30 AM, Mr. King reported to infirmary nurse E. Eastman, RN ("Nurse Eastman") that he "was beat up but was afraid to say anything." At approximately 9:00 AM, Nurse Eastman informed the on-duty Watch Commander of Mr. King's accusation.

72. The Watch Commander allegedly launched an investigation, but, again, no photographs were taken of Mr. King's injuries, nor was any effort made to do so.

73. On December 4, 2019, Mr. King continued to suffer, complaining of shortness of breath, pain, and fatigue. As the facility could not administer appropriate pain management, Mr. King was offered only ibuprofen – basically no treatment at all.

74. At approximately 7:50 PM, Dr. Chaudhry, fearing Mr. King may again require a chest tube placement, referred Mr. King back to SEMC for an acute evaluation.

75. At approximately 8:54 PM, Mr. King arrived at the SEMC emergency room via ambulance. After being assessed at SEMC and receiving pain medication, Mr. King was discharged from the emergency room at approximately 1:03 AM on December 5, 2019.

76. At approximately 1:34 AM, Mr. King returned from SEMC to Mid-State and was placed back in the infirmary.

77. Mr. King remained in the infirmary until December 26, 2019, at which time he was transferred from Mid-State to Groveland Correctional Facility.

78. For months after the beating at Mid-State, Mr. King continued to suffer from extreme pain.

## FIRST CAUSE OF ACTION
*42 U.S.C. § 1983 - Excessive Force in Violation of the Eighth Amendment*
**(Against Defendants Nagle, Shortt, Bartlett, Grant, Meyers, and Madonia in their individual capacities)**

79. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

80. On November 26, 2019 Defendant Nagle unnecessarily and without provocation shoved Mr. King's face into the wall of the infirmary causing his nose to bleed during a pat frisk. Defendant Nagle also applied handcuffs to Mr. King in a manner specially to cause harm.

81. On November 26, 2019, Defendants Shortt, Bartlett, Grant, Meyers, and Madonia assaulted Mr. King without provocation while he was handcuffed in the strip frisk room at 10-1.

82. Defendant Bartlett ordered Mr. King to strip. Mr. King complied.

83. One of the Defendants then placed Mr. King in handcuffs.

84. Mr. King was not resisting, refusing to be removed or otherwise being combative with defendants.

85. Then, one of the Defendants hit Mr. King in the back of the head and then in the right side of his body, causing him to fall to the floor.

86. When Mr. King was on the floor, Defendants continued to kick and stomp on Mr. King's back and mid-section.

87. Once the beating was finished, one of the defendants threatened Mr. King that if he "want[ed] to continue breathing," he "better" lie about the cause of his injuries.

88. As a result of the beating, Mr. King sustained fractures of multiple ribs and a traumatic pneumothorax—a life threatening condition which required a chest tube placement and near-week long hospital admission.

89. Mr. King also sustained cuts, bruises, bleeding, and swelling on the right side of his back and mid-section, where Defendants kicked and stomped on him with their boots.

90. At no point was there a need to apply force; certainly, there was no need to repeatedly kick and stomp on Mr. King's back and mid-section when he was on the floor handcuffed.

## SECOND CAUSE OF ACTION
### *42 U.S.C. § 1983 – Failure to Protect*
**(Against Defendant Adamek in his individual capacity)**

91. Defendant Adamek failed to intervene while he watched the other Defendants beat Mr. King in the strip frisk room.

92. As the commanding officer, he could have stopped the beating by ordering the Defendants to stop.

93. Defendant Adamek did not intervene.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the Court grant the following relief and enter judgment in his favor:

    A.    Awarding compensatory damages to Plaintiff against all Defendants.

    B.    Awarding punitive damages against Defendants Adamek, Shortt, Myers, Bartlett, Grant and Madonia.

    C.    Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

    D.    Ordering such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       November 9, 2022

**LAW OFFICE OF AMY JANE AGNEW, P.C.**

By: _/s/ *AJ Agnew*
Amy Jane Agnew, Esq.
*Counsel for Plaintiff*
Bar No. 700639
24 Fifth Avenue, Suite 1701
New York, New York 10011
(973) 600-1724
aj@ajagnew.com